IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| THERESA A. JOHNSON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JO ANNE B. BARNHART, Commissioner )<br>of Social Security, )<br>)<br>Defendant. ) | CIVIL ACTION NO. 1:04CV1126-SRW<br>(WO) |

**MEMORANDUM OF OPINION**

Theresa A. Johnson brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be reversed.

**BACKGROUND**

On December 17, 2002, plaintiff filed an application for disability insurance benefits. On December 3, 2003, after the claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing. The ALJ rendered a decision on May 21, 2004. The ALJ concluded that plaintiff suffered from the severe impairments of "degenerative disc disease of the cervical and lumbar spine." (R. 31). He found that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in

the "listings." The ALJ further found that plaintiff was unable to perform her past relevant work but retained the residual functional capacity to perform jobs existing in significant numbers in the national economy. Thus, the ALJ concluded that the plaintiff had not been disabled within the meaning of the Social Security Act since the alleged onset date. On September 22, 2004, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

**DISCUSSION**

The plaintiff challenges the Commissioner's decision, arguing that it is not supported by substantial evidence because the ALJ erred by: (1) finding that plaintiff's only severe impairments are degenerative disc disease of the cervical and lumbar spine; (2) failing to credit plaintiff's testimony of subjective symptoms; and (3) rejecting the opinions of plaintiff's treating physicians.

In October 2001, plaintiff sought treatment from Dr. Robert Dean Lolley, an orthopedic surgeon. She reported pain in her neck, lower back, left shoulder, and down both legs. Dr. Lolley's examination revealed tenderness over the cervical paraspinous muscles, marked tenderness over the right sacroiliac joint and minimal tenderness over the left. Dr. Lolley diagnosed right sacroiliitis with cervical and lumbar strain. (R. 165). On January 28, 2002, plaintiff reported persistent pain in her back and neck. Dr. Lolley noted diffuse tenderness about the cervical paraspinous muscles and tenderness over both sacroiliac joints in the lumbar paraspinous muscles. On February 4 and 8, 2002, plaintiff called Dr. Lolley's office complaining of swollen knuckles on one hand. (R. 164). Dr. Lolley referred plaintiff physical therapy for an aggressive neck and back program. She was to attended therapy 2-3 times per week for four weeks, but attended only three sessions, on February 6, 8, and 15. Plaintiff again visited Dr. Lolley in May 2002. She complained of pain in both shoulders that had persisted for two months. She also stated that she had similar symptoms in other areas for several months but that the pain in her shoulders was more severe and more constant. Dr. Lolley noted tenderness to palpation along the lateral aspect of the trapezius muscles

bilaterally. Dr. Lolley diagnosed bilateral trapezius strain and treated plaintiff with trigger point injections. (R. 163).

From June through December 2002, plaintiff was treated by Dr. Christopher Miller. On June 20, 2002, she reported that she had experienced increasingly achy joints and pains for two years. She indicated that her pain was worse in her wrists and knuckles, neck shoulders, and lower back, and that it was associated with headaches. Dr. Miller ordered various screening tests and started plaintiff on anti-inflammatory medications. One week later, Dr. Miller noted that the screening tests for rheumatologic problems were negative. Plaintiff continued to complain of diffuse aches and pain and also complained of itching. She asked to see a rheumatologist, and Dr. Miller agreed that this was reasonable. (R. 194-201). On August 8, 2002, plaintiff reported diffuse severe progressive and worsening pains. Dr. Miller's treatment note states:

> She has various shoulder girdle, left elbow, right shoulder, left forearm, pains that are worsening. They are characterized as a "ping pong ball" at the base of her spine associated with some mild leg tingling. Her right index finger feels cold but that has been an off and on problem for about one year. Her right shoulder blade feels "black and blue", again a long term but much worse recently sensation. She feels "bruised" along the left forearm but has no bruising. She has difficulty walking, difficulty working. The next rheumatology evaluation available in Dothan is November and possibly January. She immediately requests a referral to UAB.

(R. 192). Dr. Miller stated, "I do think we need a rheumatologist to help us determine the source of her pain, potentially characterize what may be myofascial pain syndrome, substantial fibromyalgia or other concerns." (Id.).

Plaintiff went to UAB on September 12 and 26, 2002, where she had various tests

4

conducted at the direction of Dr. Joseph Shanahan, a rheumatologist. (R. 170-185). On September 26, Dr. Shanahan noted that the laboratory studies and nerve conduction studies were normal, and that x-rays showed mild degenerative changes in the sacroiliac joints, disk space narrowing at C4/C5 and C5/C6 and negative ulnar variance in the hands. In his assessment, he noted that plaintiff has "diffuse myofacial pain with disorder to sleep." He recommended evaluation for depression, after indicating that plaintiff's affect was "somewhat depressed," and that plaintiff became tearful during the interview. He further stated:

> We talked extensively about the importance of a regular aerobic exercise regimen for care to manage her fibromyalgia pain. I took approximately 20 minutes during the appointment to educate her about fibromyalgia and to stress the importance of regular exercise and avoidance of narcotic analgesics, which are generally ineffective.

(R. 169). In an October 1, 2002 letter to Dr. Miller, Dr. Shanahan stated, "There is no evidence of a systemic inflammatory or autoimmune disease. She likely has fibromyalgia and needs to exercise. She should also be evaluated for depression." (R. 166).

Plaintiff returned to Dr. Miller on October 21, 2002. Dr. Miller noted that Dr. Shanahan's clinical diagnosis was "more fibromyalgia than any other finding." He further indicated that plaintiff continued to have "about the same level of symptoms and has put on weight." Dr. Miller assessed plaintiff's problems as: (1) fibromyalgia; (2) mild hypertension (he suspected reactive); and (3) weight gain. He and plaintiff discussed the diagnosis, including "the pathophysiology of fibromyalgia, the lack of tissue diagnosis or known cause or cure." He outlined a treatment plan which included exercise, stretching, sleep remedies

and compliance. (R. 190).  Dr. Miller examined plaintiff again on December 9, 2002, when she reported continued pain, itching, poor sleep and weight gain.  (R. 188).[1]  In May 2003, Dr. Miller completed a physical capacities evaluation.  He indicated that plaintiff can carry 50 pounds occasionally and 25 pounds frequently, that she can sit 4 hours and stand or walk 4 hours in an 8 hour day, and that she is limited to occasional gross manipulation, fine manipulation, bending or stooping, reaching and working with or around hazardous machinery.[2]  Dr. Miller noted, that "[t]he most important thing [plaintiff] can do is aggressively [treat fibromyalgia] symptoms."  (R. 232).  In a "clinical assessment of pain" form completed on the same day, Dr. Miller expressed his opinion that plaintiff's "[p]ain is present to such an extent as to be distracting to adequate performance of daily activities or work."  (R. 233).  The form included the question, "To what extent will physical activity, such as walking, standing, sitting, bending, stooping, moving of extremities, etc., increase the degree of pain experienced by this patient?"  Dr. Miller selected the response which read, "Some increase but not to such an extent as to prevent adequate functioning in such tasks." (Id.).

Dr. Miller referred plaintiff to Dr. John Marsella, a pain management specialist.  Dr. Marsella examined plaintiff on January 29, 2003 and noted that her spine was tender to palpation and that she had widespread myofascial tenderness.  Dr. Marsella diagnosed

---

[1] Dr. Miller continued to treat plaintiff in 2003; however, records of that treatment were not submitted to the ALJ.  See R. 357-67, Exhibit AC-1.

[2] The form is ambiguous as to environmental limitations.

myofascial pain and cervicalgia. He recommended Tai Chi and "women's fitness" and ordered an MRI. (R. 318-21). On February 28, 2003, Dr. Marsella again examined plaintiff. He noted that she "has not gone to Phys. Therapy or Tai Chi yet." He again diagnosed plaintiff with "myofascial pain" and cervicalgia. Additionally, he noted that the MRI showed mild degenerative joint disease at C5-6 with mild stenosis, and a broad based disc bulge at L4-5 and L5-S1; he diagnosed low back pain secondary to lumbar degenerative disc disease and L4-5 and L5-S1 radiculopathy. (R. 313, 330-31). In an examination on March 11, 2003, Dr. Marsella noted "mild paresthesia medial forearms to little finger." On that date, he administered a cervical epidural steroid injection. (R. 303-09). On April 10, 2003, Dr. Marsella performed a greater occipital nerve block for plaintiff's occipital neuralgia bilaterally. Plaintiff reported her pain to be at a level "10" before the block and "5" afterwards. (R. 299). Dr. Marsella performed a second occipital nerve block on May 13, 2003; plaintiff's reported pain level was "3" before and "0" after the block. (R. 294). Plaintiff received another cervical epidural steroid injection on July 8; she reported that it reduced her pain level from "8" to "5". (R. 288). Dr. Marsella performed a selective nerve root block at L4 on August 12, 2003 which plaintiff reported reduced her pain level from "7-8" to "6". (R. 281). A second selective nerve root block was performed on September 11, 2003. (R. 274). On December 22, 2003, Dr. Marsella completed a "clinical assessment of pain" form on which he indicated that plaintiff's pain "is present to such an extent as to be distracting to adequate performance of daily activities or work," and that physical activity such as walking, standing, sitting, bending, stooping, and moving of extremities would

7

greatly increase plaintiff's pain "to such a degree as to cause distraction from tasks or total abandonment of task." (R. 356).

The ALJ found that plaintiff suffers from severe impairments of cervical and lumbar degenerative disc disease. Plaintiff argues that the ALJ failed to consider other well-documented problems including chronic headaches and fibromyalgia, myalgia or arthralgia. (Doc. # 10, p. 7). The determination of the severity of an impairment is a "threshold inquiry" which "allows only claims based on the most trivial impairments to be rejected." McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986).

> The claimant's burden at step two is mild. An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience. Claimant need show only that her impairment is not so slight and its effect is not so minimal.

Id.; see also Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984)("[A]n impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.").

Additionally, in evaluating disability claims,

> [t]he opinion of a treating physician . . . "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). [The Eleventh Circuit] has concluded "good cause" exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. Id. When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate [his or her] reasons. Id.

Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004).

> In rejecting plaintiff's claim that she suffers from severe fibromyalgia, the ALJ states:
>
> The Administrative Law Judge acknowledges that Dr. Miller appears to have accepted the diagnosis of fibromyalgia as the cause of the claimant's pain. However, the rheumatologist, Dr. Shanahan, did not definitively diagnose the claimant with fibromyalgia, he only indicated that it was "likely" that the claimant had fibromyalgia because there was no evidence of a systemic inflammatory or autoimmune disease. In fact, in his narrative summary, Dr. Shanahan classified the claimant's condition as "myofascial pain" with sleep disorder. Although one might argue that the claimant has, in fact, been diagnosed with fibromyalgia, the claimant has not clinically demonstrated symptoms of fibromyalgia, nor have her complaints been consistent with the recognized symptoms of fibromyalgia. Fibromyalgia is characterized by a gradual diffuse onset of stiffness and muscular pain. Although the pain associated with fibromyalgia can be characterized by straining or overuse, it is most often of a constant nature. While it is recognized that fibromyalgia can be difficult to diagnose and cannot be detected through diagnostic tests, there are medically accepted clinical techniques that help to substantiate the existence of the impairment. The Court of Appeals for the Eleventh Circuit noted that fibromyalgia "by its very nature lacks objective evidence," and, therefore, the importance of complaints and symptoms to this diagnosis are of great importance, as are treatment records, all of which are essential to a thorough evaluation of the consistency of the claimant's complaints on a longitudinal basis. Stewart v. Apfel, 245 F.3d 793 (11th Cir. 2000). In the present case, the claimant's complaints of pain have been widespread over her body, but her alleged pain has not been constant. For example, in early 2002, she began complaining primarily of neck, lower back, shoulder, and hip pain, but in May, 2002 she complained only of shoulder pain and, at the time of her examination by Dr. Shanahan in September, 2002 she stated that she was not having any significant lower back pain. There is also no reference to tender points or trigger points, and the claimant made no complaints of weight or appetite changes, unusual weakness, nigh[t] sweats, fever, chills, swelling, stiffness, shortness of breath, chest pain, palpitations, and dyspnea on exertion, nor did she report having had any joint stiffness or joint swelling. Neurologically, there was no indication that the claimant experienced any loss of consciousness, memory loss, disorientation, dizziness, tremor, paralysis, or paresthesias.

(R. 28-29).

9

The ALJ's description of the medical record is inaccurate in some respects. To demonstrate that plaintiff's pain was not "constant" – and, therefore, not indicative of fibromyalgia[3] – the ALJ notes that in early 2002, plaintiff complained of neck, lower back, shoulder and hip pain but complained only of shoulder pain in May 2002. However, Dr. Lolley's treatment note for May 27, 2002 states:

> Ms. Johnson presents with a complaint of pain in both shoulders that has been present for two months. *She has had similar symptoms in other areas for several months, but the pain in the shoulders has been more severe and more constant*.

(R. 163)(emphasis added). The ALJ further observes that plaintiff made no complaints of weight changes; however, there is documentation in the record that plaintiff reported significant weight gain. (R. 188, 190, 236, 318).[4] The ALJ notes that plaintiff did not report any joint swelling.[5] However, she twice complained of swollen knuckles to Dr. Lolley. (R. 164). The ALJ also stated that there was no indication that plaintiff had experienced any

---

[3] This premise is questionable. See Harris, R.E., *et al*., "Characterization and Consequences of Pain Variability in Individuals with Fibromyalgia," 52 *Arthritis & Rheumatism,* Vol. 11, pp. 3670-3674 (Nov. 2005)(studying variability of pain over time in fibromyalgia patients).

[4] See Teitelbaum, J., "How CFS and Fibromyalgia Stress Can Make You Gain Weight," *FM Online Newsletter, A Publication of the National Fibromyalgia Association*, Vol. 4, No. 9 (Sep. 13, 2004)("In addition to the myriad of problems that plague Fibromyalgia and CFS patients, our recent study found that these individuals have an average weight gain of 32 pounds.").

[5] See Green-Younger v. Barnhart, 335 F.3d 99, 108-09 (2nd Cir. 2003)("[W]e have recognized that '[i]n stark contrast to the unremitting pain of which fibrositis patients complaint, physical examinations will usually yield normal results – a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions.'")(citation omitted).

paresthesias; however, the record contains reports of numbness, tingling, reduced sensation, and paresthesia. (See, *e.g.*, R. 165, 192, 281, 306).

The ALJ notes that there is "no reference to tender points or trigger points." (R. 29). It is true that neither Dr. Shanahan nor Dr. Miller reference the presence of a certain number of tender points. However, the record includes notations of tenderness upon examination in areas that correspond with several of the 18 ACR tender points. Dr. Lolley noted tenderness over the cervical paraspinous muscles and the lumbar paraspinous muscles over both sacroiliac joints, and tenderness along the lateral aspect of the trapezius muscles bilaterally (R. 163-65). Though he did not identify specific locations, Dr. Marsella noted "widespread" myofascial tenderness on examination. (R. 319). Additionally, in a memorandum addressing adjudication of fibromyalgia claims, the Social Security Administration has stated:

> Fibromyalgia is a disorder defined by the American College of Rheumatology (ACR) and we recognize it as medically determinable if there are signs that are clinically established by the medical record. The signs are primarily the tender points. The ACR defines the disorder in patients as "widespread pain in all four quadrants of the body for a minimum duration of 3 months and at least 11 of the 18 specified tender points which cluster around the neck and shoulder, chest, him, knee, and elbow regions." *Other typical symptoms, some of which can be signs if they have been clinically documented over time, are irritable bowel syndrome, chronic headaches, temporomandibular joint dysfunction, sleep disorder, severe fatigue, and cognitive dysfunction.*

SSA Memorandum, Fibromyalgia, Chronic Fatigue Syndrome[,] Objective Medical Evidence Requirements for Disability Adjudication (May 11, 1998). Thus, the Commissioner suggests that symptoms other than tender points can be "signs" if they have been clinically documented over time. The record contains treatment notes evidencing reports of poor sleep,

fatigue and headaches over a substantial period of time (R. 167, 188, 192, 196, 235-36, 294, 299, 306, 318, 328) which, in addition to the clinical observations of tenderness described above, support the diagnosis of fibromyalgia by Dr. Miller, plaintiff's treating physician, and Dr. Shanahan, the examining rheumatologist.

The court concludes, on examination of the present record as a whole, that the ALJ's finding that plaintiff's only severe impairments are cervical and lumbar degenerative disc disease is not supported by substantial evidence. This error at step two impacts the remainder of the sequential disability evaluation.[6]

## CONCLUSION

For the foregoing reasons, the decision of the Commissioner is due to be REVERSED, and this action REMANDED for further proceedings consistent with this opinion. A separate judgment will be entered.

Done, this 31st day of August, 2006.

/s/ Susan Russ Walker  
SUSAN RUSS WALKER  
UNITED STATES MAGISTRATE JUDGE

---

[6] The court does not intend to suggest that the Commissioner must find, on remand, that plaintiff's fibromyalgia or chronic myofascial pain is disabling.